I'm advised by the clerk that all counsel are present, who need to be present, and so we will proceed. We have one motion scheduled for argument this morning. This is N. Ray Emanuel Asare. Please begin, counsel. Thank you. Good morning. May it please the court, my name is Stephen Warshawski, and I represent the petitioners, the defendants below, who are seeking a writ of mandamus directing, or rather overturning, the district court's orders directing the appointment of a court-appointed expert witness. Those orders were issued after the conclusion of the bench trial in this case, sua sponte, and in response to the defendant's motion to strike the expert testimony of the governments retained expert. If you look at the record, we had a bench trial in October, from October 15 to October 17, and at the conclusion of that trial, the district judge issued an order that afternoon saying, the evidentiary portion of the trial is concluded, and I'm ordering the parties to submit post-trial briefing as to what has and has not been proven, and so forth. That very next day, the defendants filed a motion to strike the expert testimony of the government's retained expert, Dr. Charles Flexner, which was offered in rebuttal. And then we briefed that motion, but instead of ruling on that motion one way or the other, the district court, sua sponte, issued an order to show cause under Federal Rule of Evidence 706A as to why the court should not appoint its own expert to opine on the exact same subjects as Dr. Flexner. Within the district court's discretion, the district court feels that it needs expert advice, rules given the authority to engage an expert as needed. And so, I'm wondering, if the district court is not able to provide that advice, how can we call that an abuse of discretion or a mandamus worthy order? Well, the district court certainly has discretion under 706A, but it's not absolute, and it's an abuse of discretion in this case for at least three reasons. Number one, because the order was issued after the conclusion of the bench trial, after all the evidence had been submitted. And so the judge... If the district court is assessing the evidence that she's received and decides that she needs help because this is a technical, medical matter about universal precautions and so on, why does the timing of it not put it beyond her discretion? Well, because in this particular case, the information the judge said she needed assistance with was the very testimony of the government's retained expert. This was information that was offered in impeachment and on rebuttal and was not central to any of the liability or damages issues in this case. What happened was we moved to strike that testimony, and the court appeared to say, well, maybe I should find another way to get this testimony in. And so the second reason why this is an abuse of discretion is because the court appears to be using the bench to get involved in the presentation of evidence in favor of the government in this case. Won't that be an adequate ground for appeal after this is done? Why would we intervene with a mandamus, which is an extraordinary right? I've been on this bench 16 years in Issue 2. So why would we do that? You've got an adequate remedy if you think that interfered and was an abuse of discretion at the time of the appeal. Well, only if it can unring the bell, can't you? It's not an adequate remedy in full because when the court appoints an expert, it requires the parties to pay for it. Will you get your money back if we reverse? Are you worried that the United States government will reimburse you? I respectfully disagree. I don't know what mechanism there would be for the defendant to get its money back if on appeal the court reversed that decision. You don't know if you're going to have to pay, do you? The court has indicated that both parties are participating in this process. Do you know how much you're going to have to pay? Specifically, no. But we know we're going to have to pay. If you were ordered to pay $100, do you think you've got a chance of getting it back? I didn't catch that. If it's only $100. $100. Well, that's really not the issue here, Your Honor. Not the issue, but it's a question I ask. Well, we don't know. My own view is that would be an abuse of discretion. I think it would be an abuse of discretion for the district court to charge the government with the full or substantial cost for this court-appointed expert. So the government, so the court is going to likely split the cost, and those costs are going to be at least $10,000 to each side. Go ahead. I apologize. I understand your, get your argument about abuse of discretion. I get the argument about an element of unfairness in this because you then had to prepare your case without knowledge of what this expert was going to say. And you relied on whatever the government's proffer from its expert was in fashioning your case. But at the end of the day, I guess I have the same question that Judge Wesley has. I don't see how your entitlement to the relief you're seeking is clear and indisputable. Well, I think what's unique about this case is twofold, that the order was issued at the conclusion of the trial after the district court itself recognized that all the evidence had been submitted. And secondly, the order is expressly intended to provide substitute testimony for the retained expert of the government. And so in that case— It's unfair, but why is this a proper subject of mandamus relief is the issue. Well, the specific issue for mandamus is whether there is harm that can't otherwise be remedied. And the harm in this case is going to be the amount of money that the defendant is going to have to pay for this because there is no mechanism whereby that money will be reimbursed. So he could stay up the payment of that pending appeal? Well, the district court sua sponte has stayed the action below. No, no, no, that's not what I asked you. If you lose here and you go back and the witness, and you go through it, and the court then orders that you pay, could you seek a stay? Well, I suppose— Because you wouldn't have to pay? I think that would be a very difficult thing to do because the court-appointed expert is entitled to be paid. The judge is going to order us to pay it. Now, it would be unusual for the judge to require a court-appointed expert to do work without getting paid. And so we could refuse to pay it, but then we have a contempt problem that's not a required prerequisite to seeking mandamus. Have you raised this with the district judge? I'm sorry? Have you raised the payment issue? I raised—yes, we raised the payment issue in our objections to the original order to show cause. In terms of it was unfair to require the defendants— But you're judging substance that this shouldn't be done, but in any event, the government should bear the entire cost, if that's your principle. Well, we could take that position. Then the government is simply going to argue that under the rule that would be an abuse of discretion. This is a court-appointed expert. This is, as you suggest, and we're just getting a glimpse of the case, a somewhat unorthodox procedure. So, you know, you're a distinguished member of the bar, so you could bash an argument that this cost should be borne by the government. And then, you know, if you don't prevail, we're always open for business. Thank you. I think we have the arguments. We'll hear from the government. Thank you. Good morning, Your Honors. May it please the Court, Arusty Chaudhary from the United States Attorney's Office on behalf of the United States. In this case, a petitioner is seeking mandamus, and the only irreparable harm that they have asserted is cost of litigation, which is never an irreparable harm. And on that basis alone, this Court should deny that. Could you address the issue of costs, though? I mean, these could be significant costs. We have no idea how much they're going to be. Typically, my understanding is that they are shared by the parties. And, you know, if your adversary were to prevail later on with this argument that this was an abuse of discretion, what remedy does he have to recover those costs, which could be significant for an individual? So the cost could be significant. I'm not sure at this point what the remedy may be, given the fact that the district court can order the splitting of the fees in any particular way. However, if that is an order that is appealed to this circuit, then it should be – this circuit should be able to address it in any way it sees fit, including changing the order – who is supposed to pay. The government has no – if I hear you correctly, has no quarrel with the proposition that all the fees can be shifted to the government. Depending on how the order is structured and how things transpire. As an abstract principle. As an abstract principle, I don't see – with all the caveats that can come from the application of an abstract principle to a specific set of facts, no, the government doesn't. Well, the question is – it's a simple question. If the judge were to split the fee – and I don't blame your opponent for complaining. I mean, he's got a client and he doesn't want to have to have his client pay those fees. I don't blame him at all for being upset about it, especially since it's your expert that seems to have generated the need for this. Now, wait. Take it easy. Take it easy. All right. I can see it. So say the district court says 50-50. And it comes up here and this court says, no, that was an abuse of discretion. It should all lie on the government's – A, it was an abuse of discretion to order the expert, and B, all the costs should lie with the government. Are you of the view that we're without the authority to do that? No, I think – Short of some sort of legal error? No. But I do want – Let me be sure I understand the procedural posture. The court went down this road without any request or pressure from the government. Is that right? Correct, Your Honor. And tell me again what happened to your expert at trial. So the case concerns Title II of the ADA, and the government has asserted a claim that the defendants have employed an exclusionary criteria in violation of the ADA. In the course of – we presented our evidence in our case in chief. I know the background. Just limit – you don't have that much time, so just limit it to the expert. So our expert was held for rebuttal. The defendant's – defendant doctor provided testimony, which was effectively expert testimony that had not been disclosed to us. Our expert was in the room, listened to that testimony, and proceeded to take stand – to take issue with statements – the testimony that the defendant had made on direct and cross. We held him in abeyance specifically for that purpose, and that's what he testified to. After the close of discovery – I mean, sorry – after the close of evidence at trial, the defendant made a motion to strike that testimony as not being disclosed ahead of time. We have – you know, our opposition papers include – It was granted. It was not granted. There was no – that – yeah, that motion has been held in abeyance, and – to address this particular topic first. So pending decision on that motion, Mr. Court has appointed or – Plans to appoint. Plans to appoint and issued an order to show cause why she should not appoint an expert under 706 to give her guidance about the issues that were debated between the plaintiff's expert or physician witness and your expert, is that correct? Correct, Your Honor. So the procedural posture is that we have two sets of expert statements that are being made, and the court hasn't ruled whether our expert is getting excluded or not, but the district court has now – is planning to appoint a 706 expert in order to provide testimony on the topics in which there is disagreement. All right. It's all about blood tests. It's about blood tests, universal precautions. This question asks whether the defendant had imposed a discriminatory practice to identify HIV-positive individuals to then refuse to treat them, and asserted that it was good medical practice to do so to test the blood, and testified to that effect and identified a standard. Then your fellow gets on the stand or your witness gets on the stand and says, no, that's not the standard anymore because of precautions that can be taken with regard to surgery. Blood typing and the presence of HIV or HIV antigens are no longer relevant with regard to invasive surgery. The type of surgery, the classic surgery that must be performed, correct? Correct. All right. If the court has no other questions for me – Very good. I think we have the arguments. We'll reserve decision. Thank you. Thank you. Thank you both. Thank you both. I will proceed to the day calendar. The first case is Gail v. Chicago Title Insurance, number 173497. May I proceed? Mr. Jasinski, please. Thank you, Your Honor. May it please the court, my name is Matthew Jasinski. With me is my colleague Jessica Colombo. We represent the plaintiff, Sean Gail, and his law firm. The issue in this case is whether a plaintiff who amends a federally filed complaint to dispense with class claims following the unsuccessful attempt at class certification, deprives the court of CAFA jurisdiction. Whereas here, there is no contention that CAFA jurisdiction was lacking at the outset of the case, the answer is no, it does not. This conclusion is compelled by long-standing jurisprudence governing diversity jurisdiction. How do you get around Rockwell? Rockwell seems to be a significant problem for you. Well, Your Honor, there are a few reasons why Rockwell is not an obstacle here. And I would actually invert the idiom. Rockwell is really a sheep in wolf's clothing. Rockwell is sui generis. It's also a Supreme Court case. Yes, absolutely. So here are the reasons why. First of all, let's take the proposition that Rockwell says we look to the amended complaint to assess jurisdiction. What the amended complaint in this case says is that this was filed as a class action and that there was jurisdiction at the outset of the litigation. What matters is what does jurisdiction require? So in Rockwell, it was a federal question case. It was very unique because it was under the False Claims Act and it was under the original source requirement of the False Claims Act, which at the time was jurisdictional. And the False Claims Act said to be an original source, you had to be an original source of the allegations in the case. Well, what were the allegations in the case? The Supreme Court said, well, they were the allegations of the original complaint as amended. You couldn't be an original source of only allegations contained in the original complaint and not allegations contained in the amended complaint, which in that case were actually the ones that tried, and say that you have original source status. So what was required in that case was not met. And in this case, what was required was met. This is a form of diversity jurisdiction, right? Correct. Do you have any cases in which, let's say the diversity jurisdiction cannot be amended away? I know that we have diversity at the very beginning when the complaint is filed, that if a plaintiff moves then and diversity is destroyed by that act, so long as the complaint was brought in good faith and the allegations were made that the diversity jurisdiction is maintained. But if a new complaint is filed that does not have an amended complaint based on the same transaction or occurrence, what have you, but the amended complaint does not adequately support diversity jurisdiction, do you have any case saying that diversity nonetheless persists? I'm going to answer yes, although with a caveat, which is that I think what's important is that the amended complaint has to show that jurisdiction exists. But the question is how. So let me give you an example. In this court in LeBlanc. Is this going to be a case where the amended complaint doesn't have diversity? Well, yes. So let me give you, LeBlanc was a case in which a Canadian citizen was a plaintiff along with a New York citizen. They sued a New York company. The basis of jurisdiction in the original complaint was admiralty. It was a kayaking accident. Subsequently, the court concluded that there was no admiralty jurisdiction. And so what the plaintiff sought to do was amend to allege diversity jurisdiction and also to remove the non-diverse New York plaintiff. So what was going to be the case was the Canadian citizen was going to be suing a New York company. The only problem was that subsequent to filing the case, the Canadian citizen had become a New York citizen. And so the argument was... But that's a different case. Well, I don't think so, Your Honor, because the allegation and what the court allowed, the court allowed the amendment to go forward. And the reason was because she could allege that at the outset there was diversity. She could allege at the outset there was jurisdiction. So even though if she were bringing that case afresh at that point when the amended complaint was filed, she couldn't start that case in court at that time. The amendment was proper because she could allege that she had been diverse at the time the case was filed. This is exactly the same paradigm. Where here the allegation in the Fourth Amendment complaint is this case was filed as a class action under CAFA, under Rule 23. It met the standard for the amount in controversy, an aggregate of $5 million, and there's no dispute that there's minimal diversity. We agree with this. This allows every... You can game this every time you want. You just allege a CAFA claim, and you allege $5 million, and then you get to the Fourth Amendment complaint. You say, oh, jeez, no, we're not going to have a class action anymore, and our damages are $4,000. You've back-ended into federal court where you never had a claim in the first place. I don't think so, Your Honor, because what you've just described would still not be allowed. It's not allowed today, as many courts have provided. Why is that what you did? Well, it's not what we did because we actually moved for class certification, obtained a class. That class was de-certified. And then it was withdrawn, right? Yes. And then you withdrew the CAFA allegations. We didn't withdraw the CAFA allegations. I think that's critical. What we alleged was the case was brought under CAFA. It was a class action. Oh, yeah, that it was brought, but that currently you didn't seek CAFA relief. But I think that's no different than if— You didn't meet the—so I don't—I mean— Let me give you another example. If the amount in controversy in the case goes down during the penancy litigation— this was a case in the Southern District of Florida, a Regents Bank case, where at the time that the case was brought, the amount in controversy was over the jurisdictional threshold. Subsequently, part of the note was paid down so that it fell underneath the jurisdictional threshold. An amended complaint that reflects that change in circumstances— That's fine, but let's take a different case where you originally alleged $75,000, and then you say, well, we were wrong. It's really only $4,000. If it was wrong at the outset, then in that case the court never had jurisdiction to begin with. But there's no allegation here that the allegation of the amount in controversy was wrong when this case was filed. It was right. In fact, the reason why the case was de-certified was because of a change in the law as a result of Walmart and the defendant saying that the monetary relief sought was non-incidental. It was too much. So I think this case actually falls within the ambit of cases where you have a good-faith allegation of diversity of jurisdiction that is true at the time. There are subsequent events in the course of litigation. In LeBlanc, it was the party moving from one state to another. Here it was de-certification by the court where the case was no longer a class action at that point. And so all our amended complaint did was reflect that fact. And the case law is clear that the denial of class certification, or in turn the de-certification, does not deprive the court of Catholic jurisdiction. And just if I may. Please take a little more time. We have some more questions. Walmart just says that Walmart didn't change the law. It just clarified it in a sense. I mean, Walmart's different from LeBlanc going from a Canadian citizen to a New York citizen. That's a change in fact. But Walmart was saying you're not entitled to this. Well, it may well be that your legal theory got cut off from underneath you, but that doesn't mean that it was legitimate when you first alleged it then. Well, Your Honor, but so — I mean, that's a different animal, isn't it? Well, no, and here's why. I think when you look at all the circuits to — If Walmart were the law at the time you filed your complaint, would you have had a class action? I think we would have. I think we would have had it proceeded under Rule 23b-3. It was a contract upon which you were decertified, wasn't it? Well, we were decertified because we had met the Robinson, I think it was a railroad case, for the standard for 23b-2 certification at the time that we filed it, and then Walmart said no b-2. And so the question was could we proceed under b-3. But let me address your question, Judge Wesley. I think — I seriously question whether you were a legitimate class action at the time you filed. Well, I understand that, Your Honor. But the case law is clear that irrespective of the reason why a court denies class certification, the court doesn't lose jurisdiction at that point. So the fatal flaw here is a completely formalistic one. The moment that the district court decertified the class, nobody disputes it retained CAFE jurisdiction. So when we say we're not — okay, we accept the court's decision. You mean at the point of decertification? At the point of decertification. The mere fact of decertification deprived the court of — or did not deprive the court. Correct. Nobody disputes the court retained jurisdiction at that point. So we're talking about this very formalistic argument that somehow when we amended the complaint to conform to that and we basically accepted the district judge's determination and said we're not going to try again. But wait a second. The district court decertified your class without prejudice and said that when you proposed amending the complaint that from his perspective it's not strictly necessary. Right. It's true. That's true, but the point remains — And you said it's involuntary, so why did you amend? Right. Okay. So the — I think the point about voluntariness — I'm not sure your question is why we amended. We amended because the defense asked us to amend, because the court had said — The defense asked you to do things all the time, and, you know, as a lawyer, you always have the option of saying no. And I think depending on how this court rules, that's going to dictate what the answer would be going forward. And it's a fair point, and I understand that. And I don't want the court to get hung up on the voluntariness because I don't think that's the critical assessment. I think the assessment is this is the context where there had been a class action that was brought in federal court. It was prosecuted as a class action. Nobody can dispute that. Nobody can dispute as a class action that the aggregate amount controversy was $5 million. The district court then ruled. Now, nobody disputes that at that point the court retained jurisdiction, and it would have even if at the moment the court ruled we said, okay, judge, we're not going to try again. What the defendants contend is simply because the amended complaint reflects that fact that the court lost jurisdiction at that point. And I just do not believe that that's — An amended complaint that is filed, if you start with a complaint that has both a federal question claim and a state law supplemental jurisdiction claim, if you amend the complaint and remove everything federal about it and refile with just state law complaints, the court typically would look to that complaint and have jurisdiction, discretion to continue to take the state law claims, but more typically would dismiss, I think. That is true. Absolutely. What is different about that situation from yours? That's a federal question rule. That is not a diversity rule. Well, we have — CAFA has a lot of different characteristics, and, you know, it does come under the diversity statute. Nonetheless, it has some federal question aspects to it, I would say. Well, I mean, you know, respectfully, Judge Carney, I guess I would disagree. I mean, I think it's an amendment to the diversity statute. Other circuits that have addressed it have described it as a diversity statute. I believe this court in F-5 Capital and in Ray Touch described it as an amendment to diversity. I think it should be viewed in the context of diversity. And I would ask the court, what happens if we did exactly what we did, amend the complaint, and then we, the plaintiff, turned around and said, oh, Judge, now you've lost jurisdiction. We want to go to state court. What would the defendants be saying then? I mean, there is — the form manipulation concern that animates so much of the jurisprudence is just not present here. There can be no allegation that this case was either filed in federal court in a way to abuse federal court jurisdiction, as I think one could conclude in the in Ray Touch case, and there's no contention, nor could there be, that the amendment in this case was some sort of effort at form manipulation. But we need to have a clear rule about what we look to in determining jurisdiction in what context, and we're not going to examine the party's intent all the time. We look at situations that provide a possibility for abuse one way or another. Understood. And I think that there's — I think it would be a mistake to try to draw a bright-line rule that any time there's an amendment, that's it. If you look at this court's reasoning in the Tong Cook case, for example, which is a case in which the court said that the legal impossibility of recovery at the outset must be so certain as to virtually negate the plaintiff's good faith in assessing the claim. What is the rule going forward for you to win, that even though you do amend the complaint and take out the Catholic claim, that you're entitled to jurisdiction because the well-pleaded complaint initially had a Catholic claim in it? Yes. And you were decertified? Well, I don't think — I think that we would win if the court crafted a rule that said when a plaintiff has made a good faith attempt at class certification,  and subsequently a plaintiff amends the complaint in conformity with that decision, that does not oust the court of Catholic jurisdiction. The problem with that approach is procedural rules in the vast majority of instances have to draw clear lines. I mean, you're inviting litigation over whether the Catholic allegations were in good faith. How would a court ever determine that? I don't think this is any less clear than diversity jurisprudence that currently exists, Your Honor, which looks at — that gives the benefit of the doubt to the plaintiff in alleging the amount in controversy and diversity jurisdiction, and in the Tom Cook case says if it was legally impossible at the time, then that will negate it. So obviously if the plaintiff comes along and says, I'm from New York and my adversary is from Connecticut, and it turns out at that time that was not true, or the plaintiff amends the complaint and says actually that was not true, the court never had jurisdiction to begin with. If the plaintiff comes along and alleges an amount in controversy over the jurisdictional threshold and ultimately is unable to prove that amount, the case is not dismissed. If it was possible and pled in good faith, but possible, not legally uncertain at the time it was pled, that that was the amount in controversy, then it's accepted. And I think that Reynolds' case out of Florida is an example of that, where actually there was a subsequent event and the note being paid down. Here the subsequent event is the court's determination that ultimately it would not certify the class and our acquiescence to that. Very good. You have three minutes for rebuttal. We'll hear from your adversary, and I will give your adversary seven minutes on top of the ten he already had. Good morning. I plead the court, Ross Hirsch from Herrick Feinstein, for dependent's appellees. This case is squarely governed by the Supreme Court decision in Rockwell versus the United States. The court in Rockwell set forth an exception to the once jurisdiction, always jurisdiction rule. That exception being when a plaintiff files a complaint, the federal court voluntarily amends that complaint. The court looks to the amended complaint to establish jurisdiction. So do you agree, though, that if they hadn't amended their complaint that the court would have continued to have jurisdiction? Yes. So the amendment of the complaint is the pivotal point. The amendment of the complaint, and also what's relevant here is the way that the class deserification ruling was handed down. It was not with prejudice. It was without prejudice. It was also without reasoning. It was unclear what they needed to do to amend their complaint to satisfy the district court on class certification. The court invited them to attempt again. The court left it on the table. There were discussions of the parties. But gave no reasoning at all. Isn't that correct? I believe it gave some of them. This was in a transcript. This was in an oral conference. Correct. Correct. I think, and the Supreme Court in Rockwell went on to say that it's not just about the allegations when the complaint was filed. But if an amended complaint, the plaintiff withdraws the jurisdictional allegations, withdraws the basis from jurisdiction from the complaint, the case should be dismissed unless the plaintiff then puts back other replacement jurisdictional allegations. So when you withdraw the basis for jurisdiction and don't replace it in an amended complaint, the amended complaint is absent jurisdiction. And though my opposing counsel cited the LeBlanc case, that case was pre-Rockwell. Let's look at how this court, in the circumstances presented here, addressed Rockwell. And I'm talking specifically about in touch concepts. Albeit in dicta, it addressed the specific circumstances presented here. And by specific circumstances, I'm referring to three factors. The first factor is a claim filed in federal court, not a removal case. The second factor is a CAFA case, a case where the jurisdiction is based on the Class Action Fairness Act. And the third factor is a case where in an amended complaint, the plaintiff withdraws the class allegations. And in touch, after citing the principle from Rockwell that if this case had been filed originally in federal court, the district court would have had to dismiss it. Sorry. It cites Rockwell for the principle that when a plaintiff files a complaint in federal court and then voluntarily amends, the court looks at the amended complaint. And then this court went on to say, so if this case had been originally filed in federal court, the district court would have had to dismiss it as soon as plaintiff filed the first amended complaint, which dropped all class allegations and thereby destroyed the basis for jurisdiction. Let's talk for a minute about the circumstances of the amendment of the complaint, because it looked to me like there was a sandbagging element here based on what the transcript showed, that no amendment was, strictly speaking, necessary to go forward. The district court said it's not really necessary. But it looked like the counsel for Chicago Title, and that may have been you, kind of insisted on having a complaint filed that conformed to the district court's ruling, that the case had been pending for so long without action. It looked like the district court was eagerly awaiting settlement discussions to take place, and years had passed. And in order to clarify the legal issue, you all pressed the plaintiffs for an amendment of the complaint rather than just allowing them to say, okay, we're going forward on an individual basis, which the court's rulings had limited you to in any event. Why shouldn't we infer a measure of bad faith here that would overcome some of the arguments you're making? Respectfully, I don't believe that's an accurate recitation of how this went down. In 2012, when the court decertified the class, the court said specifically to everybody, well, to be clear, I don't mean to apply that no class should ever be certified on any issue in this case. And further went to say, I just want to be sure that nobody misinterprets my ruling. I'm not taking a position now that class certification is not appropriate. I'm simply decertifying the class and allowing for the possibility that a motion to certify might be filed down the road. With all parties understanding that, in 2016 — Four years later. There were motions — With no action. There were motions pending that the court hadn't ruled upon. There was action. There were motions made on standings ground and other motion practice during that time. There was a decision that the parties were waiting for. The plaintiffs were restless and did not want to have to live by the one-way intervention rule and have to wait for the sequencing of motions. So on their own volition, they wrote a letter to the court saying we're prepared to abandon our damages claim and move forward exclusively in our individual capacities. And then — this is critical — at the subsequent court conference on March 9, 2016, this is what plaintiffs' counsel said. So the question that was left open was, in fact, coming back and removing under B-3. So the class allegations are in the complaint. The intention is, once the standing issue was removed, to come back on a B-3 motion. What we're saying in this letter is that the possibility of that occurring was something we were taking off the table. We discussed this with Mr. Gale. He understands what we are proposing, which is to withdraw in any form the class allegations, withdraw in any form the damages allegations. This idea is on them. It is their idea. It is their volition. They came to the court with it to accelerate the action. This is a strategic decision that they made. The court specifically left the issue of class certification open, invited it to come back. It was anticipated that they would come back. Yes, the case took a long time to proceed through motion practice. That's not on either party. That is just something — When he moved to dismiss, did they claim that you'd snickered them somehow to withdrawing that? No. Did they tell the judge that you'd acted in bad faith? They made an argument that it was involuntary because of the class certification, but there were non-accusations of bad faith, and there still aren't any today. The judge had said that he'd reconsider it, so — Correct. There's been no accusations of bad faith by plaintiffs' counsel, and there couldn't be. This is a strategic decision they made. Whether or not it was a decision that they regret now, that's a different story. But it was a decision that they made. It's the epitome of voluntary. It's not a situation — if you contrast this to the Calvillo case in the South Dakota that plaintiffs rely on, in that case, the class allegations were dismissed with prejudice. The plaintiffs appealed into locatory appeal. That appeal was denied. Then the court instructed — instructed the plaintiffs to amend their complaints to remove the class allegations, and they did. I'm reading the transcript that Mr. Newman said. That's the first order of business. Mr. Newman is who? First American counsel. Yes. He says the first order of business, as we said in our letter to the court, is for the plaintiffs to move to amend. File that. We have an opportunity to review it, see the claims that are then asserted, that there's only equitable relief, and then we go forward. That will be the fourth amended complaint. And the court says that's not, strictly speaking, necessary. And then they go ahead and do that. You're saying it was their idea to begin with. There was a letter that preceded that that's in the record where it was their idea to remove the class allegations from the action. And I think what was said back to them that the only way to actually remove them from the action is to amend the complaint. The idea to move forward without the class allegations was their idea. No one told them to do anything. No one instructed them to do anything. No one was being held hostage. This was a strategic decision made. There was a dialogue back and forth what it means to remove class allegations from a complaint, and that is through an amendment. But no one told them to do it or persuaded them to do it. But you're saying also that even had they not amended the complaint, or that had they not amended the complaint, the substance of the action would have been the same and the court would have had jurisdiction. The court would have had jurisdiction because the class certification remained open. The class decertification was not, it was not dismissed with prejudice. It was dismissed without prejudice. But it is the act, as the Court makes clear in Rockwell, as this Court makes clear in the touch, the act of an amendment is an important event. It recepts the allegations in a complaint. The Court looks to amend a complaint which supersedes the original complaint. Rockwell dealt with the False Claims Act in which there are very explicit grants of jurisdiction and jurisdiction stripping provisions in the statute as it stood at the time. Why isn't that different from CASA? Well, I think Rockwell, though it applied to a specific situation, it set forth a general rule for amendments that drop jurisdictional allegations. It discussed the different circumstances in which that would be triggered, and one is here where the jurisdictional allegations are removed. As your adversary has pointed out, though, this is a form of diversity jurisdiction and somewhat different rules apply, right? Sure. So I think it's useful to look at the way courts have applied Rockwell in either CAFA cases or, I think, regular diversity cases afterwards. With respect to CAFA, you have this Court in dicta and touch, you have Cunningham in the Seventh Circuit, and you have Wright in the Eleventh Circuit. Changes in diversity between the parties don't affect the Court's jurisdiction, but this is a change in the allegations with regard to the complaint. Correct. So it would be like saying that I'm a citizen of New York, but then I was wrong, I really am a citizen of Connecticut, and there's no diversity. Correct. Once the Court decertified, what do you think the options were with respect to amending? The overall options, obviously, they had the right to appeal. They had the right to recertify.  They had the right to recertify. They didn't have to amend the complaint. What was left? Why didn't they have to? They could proceed on their own claim, right? They could proceed on their own claim, and they could recertify at whatever point they felt appropriate. It was understood that they would move to recertify until the moment they decided not to. You're saying had they not removed the class action, the original class action allegations? Notwithstanding the fact that they proceeded individually, they'd be allowed to do that in federal court. Without the amendment? Correct. That's what I meant. This proposed rule, though, also leave open the possibility that a plaintiff starts with CAFA allegations in federal court, decides that the judge doesn't really like their case, and so amends to eliminate the $5 million element, for example, and gets himself kicked out of federal court so he can try again in state court. Isn't it as manipulable as general removal actions and artful pleading allowed with forum shopping in other cases? No, I don't believe so, Your Honor. If he wanted to be in federal court or state court, he would have started there, wouldn't he? I mean, he doesn't have to start in federal court with a $5 million claim, a plaintiff. Correct. A plaintiff can sue a class action wherever they wish to do so. It might be removed, perhaps, by defendants under CAFA, but if a plaintiff wants to start in state court, or wants to end up in state court, they can start there, can't they? Correct. The courts have been very clear. But one could also start in federal court or start in state court, be removed, or start in federal court and then decide you don't like how things are going and then drop the CAFA-related allegations. There are lots of machinations that attorneys can do. I think the Court has specifically drawn a line between removal cases and non-removal cases to address the forum manipulation concern. That is a line drawn in Rockwell in footnote 6. They specifically distinguish removal from non-removal. This Court in Touch did the same, saying there's a special rule in removal cases to address forum manipulation concerns. This is not that. This falls squarely into In Touch. In Touch makes it stay where you start it if you try to remove it. Unless if you start in federal court, yes. Correct. If you start in federal court, you go under CAFA jurisdiction, you remove all class allegations from the complaint, you no longer have a basis to be in this court because CAFA is diversity, but it is a special kind of diversity. It's based on the nature of the claim. If that nature of the claim no longer exists, if it's no longer a class component to the case, it doesn't belong in this court. Well, unless you can make it a regular 23. Correct. And they had an opportunity to move for certification again. They specifically and on their own volition took, in their own words, took that off the table. And in resetting the case without class allegations and without trying to recertify Once the case was decertified, is it your position that they had the option to stay in federal? Did they stay in federal court at that point and just simply litigate their own individual claim? At that point, yes. With the current posture of the case. Right. It's just the formal act of filing the amended complaint that litigated that posture. Correct. And what that formal act does, even though opposing counsel calls that, tries to insult it by calling formalistic, amended complaint is not a mere form over substance. It becomes the substance of the case. And they no longer have an opportunity to certify. They cannot appeal the original decertification. Right. It's the jurisdictional hook. It's the basis on which the court has the authority to act. Correct. So it is not a mere form. It is the form. It is the governing form. And it is a choice they made to replace one form with the other form. And this form governs. And this form doesn't have class allegations. Rockwell's. If you're right about Rockwell, then it may seem formal to some, but it is the basis on which the court has the power to act. Correct. So a lay person may see it as formalistic, but from a judicial perspective, it is the foundation on which the court has the authority to proceed. That is our analysis. And we believe that the Supreme Court decision and those applying it have found the same. Thank you very much. Thank you. Mr. Jasinski, you have three minutes to rebuttal. Let me just start. Why did you amend the complaint? Well, obviously, Your Honor, we didn't appreciate that this would become an issue. We didn't appreciate that this would become an issue, Your Honor. Our position. It was 2007. No. Understood. Whether we should have appreciated this would become an issue is a different issue, but I'm answering your question as to why. Why was because, from our perspective, everybody agreed we were, at that point, allowed to continue to pursue individual claims. The defendant said, well, to take the putative class nature off the table, which would obviate this one-way intervention rule. You could have already done that. Well, I'm not so sure because the defendant's position was that because there was always the possibility, at least at that point, that we might try again for class certification, that we were back in putative class land, and as a result, they had the right to avoid an adjudication on the merits before class notice under the one-way intervention rule. This was sort of the stumbling block and kind of, I think, was part of the reason for the delay. But at any event, to take that issue off the table and, as they put it, to help them decide what we're settling, they said they think the first order of business is to amend the complaint. But is your adversary correct that you first proposed this in a letter to the court? We did not propose amending the complaint. What we said to the court was, after decertification, we had expressed an intent to try again. We didn't have to do that, and I don't think that my adversary is saying that the court would have lost jurisdiction if, at the moment of decertification, said we're not going to try again. But we said we're going to try again. No, you're right. Right? And so the reason I say that's important is because what we took off the table was, we're not going to try again. And we didn't say we're going to do it by way of amendment. We just said we're not going to try again. We're just going to proceed on the individual claim. Why didn't you just write a letter and say that? We did write a letter, and then the defendants asked us to amend. But let me just say, I know I'm very short on time, so let me address what Judge Wesley said, I think, which was to say that in this case, this is sort of equivalent to us saying we were wrong. That's absolutely not true. This is not a diversity case where we come in and say, oh, we were wrong, we weren't diverse, or we were wrong, we didn't meet the threshold. No, no, no, no. We allege in the Fourth Amendment complaint. We were right. We brought a class action, and nobody disputes it really was a real class action, not an attempt to manipulate the forum. We ultimately lost, and we acquiesced to the judge's decision. But then you withdrew the jurisdictional allegation? I disagree, Your Honor. We did not. Stop for a second. Yes, Your Honor. If you're wrong, do you lose? If I'm wrong about what? That you withdrew the jurisdictional allegation. Yes. Did you lose? Yes, if we withdrew jurisdictional allegations, but we didn't, because what we allege in the amended complaint is the state of things at the time of filing, which is what all of the precedent says about CAFA. The state of things at the time of filing was this was a case filed as a class action. It was a case that met the amount of controversy. If the Fourth Amendment complaint withdraws the CAFA allegation, do you lose? If it withdraws the CAFA allegation, we lose. It does not withdraw the CAFA allegation. I understand that. Yes, but it does not. And I think the. . . Take a minute. That's okay. Go ahead. Thank you, Your Honor. This is a novel question. The cases from other circuits post-Rockwell have not directly addressed this. They have all said we're not getting to the amendment question. The Wright case said we're not getting to the amendment question. In re touch was dicta. I think it's very important to consider that this is in the paradigm of diversity. And I think, Judge Carney, you're concerned about, well, what if this invites a plaintiff who files in federal court, wants to be there, and then down the road finds things aren't working out so well, can just amend the class allegations and say, you know, hey, we're going to state court now. That's not allowed. If there were any argument that when we filed this case we didn't have grounds upon which to file it as a class action with those jurisdictional allegations, then there wouldn't have been jurisdiction at the outset. That's not my hypothetical, though. My hypothetical is you had grounds. Understood. Good faith CAFA allegations, and then you decide you don't really want to be there because things aren't going well. Right. So you just amend the complaint. And so you kind of effect a reverse removal. You get yourselves out of the jurisdiction that you're in. And. . . Try your luck elsewhere. And we shouldn't be allowed to do that. Just as the defendants. . . But what prevents you from doing that under your rule? Well, our rule is the court now has had jurisdiction at the outset and retains jurisdiction. We are not allowed to amend away jurisdiction by simply taking away the class allegation when it was in good faith at the time that it was brought. And there's no dispute that it was. So the issues of form manipulation go both ways. And I think at this point now we have an attempt at forming a manipulation by the defendants. Thank you. Very good. Thank you very much. Thank you for your arguments. We'll reserve decision. The next case on our calendar is National Union Fire Insurance v. Garpo Marine Services, number 173286. Thank you. Thank you. Good morning. May it please the Court, good morning. My name is James Carbin, counsel for Garpo Marine Services. We're here today because of the multiple manifestly wrong findings of fact by the trial court and some clearly erroneous legal findings as well. This case arises out of Superstorm Sandy, and in particular the sinking of the vessel Star of America at a shipyard named Garpo Marine in the southern part of Staten Island along Arthur Kill, the body of water that separates Staten Island from New Jersey. Two of the more glaring examples of erroneous findings of fact by the district court are, number one, that Garpo did something for other vessels at its yard during Superstorm Sandy that it didn't do for Star of America. That is simply wrong. There is nothing in the record, and very conspicuously the court's opinion cites nothing from the record, that Garpo took any action for any of the vessels at its yard. Those vessels were there manned by their own captains and owners throughout the storm. I thought the district court's opinion was a little unclear about whether it was saying the shipyard took action with regard to those vessels or whether those owners who tied up the pontoon dock took action. But the point was those vessels were safe, whereas the Star of America was not. Well, whether those vessels took some action is unclear from the opinion. Your Honor is absolutely correct. There's no indication what actions, what different actions those vessels took, aside from their owners being on them and manning them and riding out the storm. Could you address the district court's finding that there was an agreement for Garpo to haul the Star for repairs before the storm? The district court found that right on the Wednesday before the Monday storm, there was telephone conversations between the owners and Garpo agreeing to do repair work and agreeing to let the Star be dropped off over the weekend, Saturday or Sunday. And to me, that leads to the notion of a bailment, that there was an agreement to do repairs, there was an agreement to drop off. And is it your position that that finding, in fact, was clearly erroneous? Yes, Your Honor. And let me address that in multiple answers. First, one of the appeals we have is an abuse of discretion by the trial court for not allowing us to explore the testimony of Doris Farrington, who testified to that verbal agreement. And what Ms. Farrington did say is that she called up on the 24th, five days before Sandy, and had some discussions with Garpo about bringing the vessel over for maintenance and also for a Coast Guard inspection that it was due. She then said, after that conversation, she spoke to the Coast Guard and couldn't get a date out of the Coast Guard. And then she never called Garpo back to firm up that agreement. We were never able to confront Dorit with the fact that she called and tentatively discussed bringing the boat over, but then never got a firm date. I know you complained about the limitation of your cross-examination, but you didn't really give a reason to the district court to say you wanted to go into it further. So the district court's making a credibility determination, having heard some of your arguments about the merits of Dorit's testimony, but it found still that there was an agreement to do the repair work. We didn't get a chance to confront Ms. Farrington with the fact that she had testified at a deposition that when she called the Coast Guard, she couldn't get a date. So how could she bring the vessel to Garpo when she didn't have a firm date from the Coast Guard, which was one of the reasons— You're saying the finding that there was an agreement to drop off the vessel and do the repair work. Yes. That was clearly a ruling. There was a discussion—well, the court found there was an agreement. We contested that there was an agreement. There was a discussion about it that was never firmed up. And our point is that it was never firmed up because—Farrington's never firmed it up because they couldn't get a date out of the Coast Guard, number one. Number two, if you've got a storm like Sandy bearing down on you and you're a captain like Michael Farrington, you don't just willy-nilly drop your boat off at a shipyard and drop the problem in their lap. Let's look at what happened here in terms of the bailment that Your Honor asked about. On Sunday, five days after this discussion that Ms. Farrington had, Michael Farrington, during that five-day period, who's the captain, he's watching the storm come up the coast. He testifies it's a nasty storm. On Sunday, the day before Sandy hits— I need you to put this in context, still, because if there was an agreement, as the district court found, to do repair work, my understanding is that that would be enough under apprelty law for a bailment to be created in which he said he was going to drop off the vessel, and he did so pursuant to the agreement. And then the burden shifts to the BLE, GARPO, to dispel a presumption of negligence when the vessel is injured. Number one, there were exceptions to that bailment. There were elements for a bailment that weren't met here. Mr. Farrington dropped the boat off when there was nobody there on a Sunday. But as agreed. That was not agreed. That was never agreed. But the district court found that there was an agreement to drop the vessel off on Saturday or Sunday. Even if you accept that there was an agreement to drop the boat off on a Sunday, Mr. Farrington tied the boat up where he wanted. He tied it up. He locked it. He took the keys. He left. He testified he was going to come back and get the boat, but he didn't do it because he mistakenly believed that the bridges were closed. Wasn't there testimony also that GARPO, when contacted on Monday morning, told him, assured him that the boat would be all right? He was told Monday morning that the boat was not going to be hauled because of Sandy. The winds were too great Monday morning to haul the boat. And he testified he didn't go back and get the boat because he mistakenly believed that the bridges were closed. You can't have a bailment where the bailee, in this case GARPO, doesn't have exclusive control. Mr. Farrington had the keys. He locked the boat. He left. He had the ability to come back. He didn't do it. GARPO did not have exclusive control. Why are the keys essential if what needed to happen was, in the ordinary course without the storm, the boat was going to be put and hauled out on a special lift that didn't require use of the keys at all? That was consistent with the agreement that the district court found, wasn't it? Well, that agreement was five days before Sandy. The morning that the court says this was supposed to happen, it was physically impossible to move the boat. Oh, wait. Because of the weather, but not physically impossible to move the boat because there weren't keys. They didn't have the keys. That's the question that you've been asked. The question is, were the keys necessary to move the boat? And the answer is no. Is that correct? Yes. The boat would normally be. So the fact that the boat is locked does not in any way indicate that your client didn't have exclusive control of the boat. What? To put it up on dry dock. Is that the weather intervened with it? The other element of the bailment that was not met is there was not delivery and acceptance. There's expert testimony. What did you say? The other element of the bailment that was not met is that there wasn't delivery and acceptance. The expert testimony is when you drop a boat off, as in any bailment, when you drop the property off, there's an exchange. And the bail will. There's delivery. The boat's there. And acceptance, the claim was, is that your folks had agreed to have the boat delivered on a Sunday. That was five days before Sandy was coming. No, I understand that. But please, just let's go step by step. I understand that Sandy changes a lot of things. I understand that. But had Sandy not occurred, the fact that it was delivered on Sunday wouldn't be a big deal. And the fact that it was locked wouldn't be a big deal. It's a Sandy intervening and the boat isn't up on dry dock and the boat gets moved. But the fact that it was delivered on Sunday doesn't mean that it wasn't delivered. And the fact that they allowed it to be delivered on Sunday doesn't mean it wasn't accepted, does it? Well, when he dropped it off, he didn't speak to anybody. There was nobody there to talk to. There was nobody there to take the boat. Does acceptance require an oral thing or could it be pursuant to it? I say to you, it's okay to drop your boat off at Wesley Marina on Sunday. I'm not going to be there. Nobody's going to be there. But just put it in the slip number one. It's okay. Would that be my setting forth the terms of my acceptance of your delivery? Those aren't the facts either. I know that. I know that very well. I'm asking you to answer my question. On your honest facts, I would say yes. Okay. Good. Now, how are the facts of your case different in terms of the factual findings made by the district court? Because there was no delivery and acceptance. There was expert testimony that when you drop a boat off at a yard, undisputed expert testimony, that when you drop a boat off at a yard, there's a handover. There's an actual change of possession. The bailee accepts the property, accepts the boat, says, we got it, this is what we're going to do, and this is where we're going to keep it. That never happened here. All right. I think we have your argument. You have a couple minutes of rebuttal. We'll go to Mr. Flood. Good morning, Your Honors. May it please the Court, Edward Flood, I represent Plaintiff Attali. With me is Mr. Martin West. Your Honor, Judge Carney, I think you kind of zeroed in on it. This was basically two factual narratives. The judge, as a trier of fact, determined that the Farrington's version was more credible and was more logical, that there was an agreement that was reached the Wednesday before. Keep in mind with Sandy, nobody knew Sandy was going to actually take the path it did on Wednesday before the storm. So they made the agreement, and it was the agreement to bring the boat over for repair because this was a long-time customer, and they made the agreement to haul the boat before the storm, before Monday. Everybody knew the storm was going to be hitting Monday. And so they brought the boat over on Sunday. The agreement was there, and there was also the phone records. Keep in mind that the Garpo personnel, they say there were no conversations at all the weeks before. They also say there was no conversation that Monday when my client called, concerned about the boat, wanted to make sure that the vessel was hauled, and they told them the vessel wasn't going to be hauled, but that they would secure the vessel and protect the vessel. Let me ask a different question. My understanding from the record is that if the shipyard had complied with its agreement and hauled the stardew dry land, it would have been able to do that Sunday afternoon or right after the boat was dropped off, for example. Nonetheless, because the storm surge was nine feet, and the boat would have been up two on blocks and then up another five, the vessel still would have been lost. Is that supported by the record? Well, first of all, they don't work on Sundays, so the vessel couldn't have been blocked. Well, one could, of course, have, in fact, worked on Sundays, given the impediments. But they don't. But they didn't work on Sundays. But if they had been able to on Monday morning. It was dropped off Sunday afternoon. They came over early Monday, and they hauled it. They did what they were supposed to under the agreement that the court found. The vessel still would have been lost because of the nine-foot storm surge, which no one foresaw. No, but the court did. Don't forget, the vessel wasn't going to be hauled until Monday morning. Mr. Gardner was aware of the storm surge on Monday morning. He was aware because— He was aware that there was going to be a nine-foot storm surge? Yes, Monday morning he was. It's in the record someplace. I didn't realize that was known before. Yes, and keep in mind that it wasn't just the storm surge. It was the winds, the 60 to 90 mile-an-hour winds, as well as the direction of the winds. And that vessel sitting there at that small dock, which was never used— No, but my point is, if they had actually hauled it, what they had agreed to do was haul it up onto and put it in dry dock to repair the jets. If they had done that, which is what they had agreed to, as the court found, the vessel still would have been lost because of the high and unexpected storm surge. We'll never know, but they wouldn't—the vessel was not going to be hauled until Monday morning. That was the point. I'm asking you, had they hauled it on Monday morning? It's possible, Your Honor. It's possible it would have been lost if they had hauled it Monday morning on two- to three-foot blocks. But there was other vessels that were also hauled on blocks and weren't floated away either. Another measure—I mean, I gather the pontoon dock was full, but another measure that was suggested is that even with it tied up to the second pier, that they could have used additional lines to secure it to the pontoon dock. Is that right? Yes, that was a feasible alternative that they didn't even think of. The bottom line is Mr. Gardner didn't think of anything to do with it. He saw that the conditions—on Monday morning, he was well aware of the danger of that vessel in that location, but he did nothing, and that's what the court said. He basically did nothing. There were alternatives. At a minimum, he should have called the Farringtons. And as he testified, there was a vessel in another yard that basically there was no spot for it, so they basically just ran up and down the river during the course of the storm, and that vessel stayed safe. If they had done that, at least called the individuals, called the Farringtons, they could have come over. Why wasn't that on the Farringtons to be checking on and be aware of? I'm sorry? Why wasn't that obligation on the Farringtons to check on it? Because when they called— Not the vessel. —the Farringtons, they said that the vessel would be protected and secured, and they saw no reason to come back. And I do take issue with Mr. Carman's testimony or his recitation of the evidence. The testimony was pretty clear that Mr. Farrington did not come back based on the fact that he was told that the vessel would be secured and protected. That was the reason he didn't come back. Regarding the keys, that's essentially a non-issue because, as Judge Wesley said, they didn't need the keys to bring her into the hauling pit. And the hauling pit was—you were supposed to move it in manually. And the only testimony that the vessel was locked up was from Mr. Garner. It wasn't from any other witnesses, but he testified to a trial. Well, to infer from the record that Mr. Farrington was negligent in his treatment of the vessel in the time between the Wednesday where the agreement was made to do the repair work and Sunday, the forecast had become so much more dire. And he just left the vessel tied up in a very temporary circumstance. Well, it wasn't until the weekend, and actually until Monday, that we knew that this storm was going to come in exactly the direction it came in and surge. And he basically just relied on the representations of the Garners that the vessel would be hauled. And, you know, it's— Why was that reasonable reliance? Because there was an agreement, Your Honor. As you pointed out earlier, there was an agreement to haul the boat, and it wasn't hauled. There was an agreement that they would— I'm asking why was it reasonable to rely on that when he dropped it off in the shipyard with no one around and the forecast between the Wednesday when the agreement was made and the Sunday had gotten so dire. But, Your Honor, they called Monday morning. And that's another factual finding that the judge made, that they called wanting to know what the status of their boat was. And at that point, the yard told them they will take steps to secure and protect the boat. There was a bailment. There were oral contract to repair. There's a warranty of workmanlike service. And I believe it was breached, Your Honor. Thank you. All right. Thank you. Mr. Carbin, you have two minutes of rebuttal. Yes, Your Honor. I'll try to be direct. Overall, let us recognize that nothing in the court's opinion and nothing in the record identifies what Garper was supposed to do or could have done to avoid this consequence. There's nothing to show Garper was negligent, that it breached some commitment to handle the boat. Did you bear that burden, or did they? That burden is upon Garper. Well, if it's a bailment, you have to show that you conducted yourself in a reasonable manner with regard to the control of the property, right? Wouldn't it be your burden to show that this is an act of God and there's nothing you could have done? I agree, Your Honor. And, in fact, the trial court implicitly found an act of God. And they went on to say that— But did Garper make any calls to the Farringtons and say, listen, you have to come get your boat and ride it up the river? They spoke to them on— The court found that they spoke Monday morning, and Garper said, your boat can't be hauled, it's going to stay where it is. And Farrington testified at his deposition, he changed it at trial, that the reason he didn't go get his boat is he thought the bridges were closed. The boat is there where Farrington put it. He tied it up, he locked it. Garper can't drive it up and down the river. They don't have authority to do that, and they don't have the keys. They didn't tell him to do that himself, right? Well, he's a captain. He's responsible for his own vessel. A captain knows what to do with his boat. A captain has primary responsibility for taking care of his boat. Well, there's a disagreement as to what was said, and the judge found that your client made assurances that the boat was going to be taken care of, and that's why Garner didn't come back. That's Garner's story. That's why— Wait just a second. So there's a disagreement about what was said, and if the judge makes a determination that he found the other side's evidence more credible, then my question to you was, did you present evidence saying that notwithstanding that credibility finding, did you establish that regardless of what you did, the boat was going to be destroyed? Absolutely. Okay. Because, number one, the court found it was an act of God, which puts the burden upon Garper to show that they're not responsible for the presumed negligence, and Garper provided ample evidence that there was nothing more it could do. It couldn't haul the vessel. If it did, it would have floated away. Physically, it couldn't do it because it went from sandy. It certainly couldn't drive the boat around. It didn't have tees. Couldn't it put additional lines onto the concrete, Doc? In fact, there was expert testimony at trial on that, Your Honor. What the expert testimony was is that would be a foolish thing to do because, in its common sense, you tie a line to a boat, you tie it to a fixed pier. Now what happens when the water comes up? One of two things occurs. Either that line breaks and you're right back where you are, or the line pulls the boat over and it capsizes, and we have the same problem. That was undisputed expert testimony. There's also undisputed expert testimony that the 9-foot surge was unprecedented in the York Harbor history, and it was poorly forecast. Mr. Garner did not know of any 9-foot surge prior to it happening that night. Thank you very much. Thank you, Your Honor. Thank you for the arguments. We'll take a moment for advisement. The final matter on for argument this morning is Baker v. Stryker Corporation, No. 18-1188. Good morning, Your Honors. My name is Edward Baker, Pro Se, and Baker v. Stryker. The key issue here is when was the damage identifiable and how this impacts on discovery. I submit the defense has never properly understood the medical case and successfully spread misunderstandings to the lower court, resulting in a wrong decision. A proper discovery process in this case could have rendered clarity. At no time did any surgeon hold the opinion prior to the removal of the defective implant that it was defective, nor could they have known. It is physically and scientifically impossible to know, as all of my doctors would testify. One has already created an affidavit to this effect. In defense documents, repeated references made to discovery beginning with the original surgery or when symptoms, when that damage began. But in this complex case, when was that particular pain syndrome manifested and which particular pain syndrome? Which in itself, I submit Judge Amon erroneously oversimplified as singular. There were multiple pain syndromes from dislocated higher bone, dissected and reattached anterior digastric, from impingement of the chin implant, not the ankle implant, which was repeatedly confused in documentation. There were mastoid sutures that were removed and others that were not removed. There was no false mental nerve. There were infra-hyoid muscles that were compressed from rotated flaps of the transected platysma. A proper discovery needs to sort these details. Mr. Baker? Yes. It sounds like you've had a very rough time with your jaw, and I'm very sorry to hear that. Could you say when you first started suffering the pain and choking sensations that you've described? Well, they were early on. But again, being able to identify the correlation. I'm running low on time. I need to get to some key points. It was immediately after the surgery. But Judge Amon erroneously restated a narrative from Dr. Michael J. Warnchuk, who I submit whose very testimony is of questionable legitimacy given the HIPAA law, which was an objection I raised to which she observed no apparent consideration. When I saw him in January of 2012, it was to pursue surgical removal of all my implants. I'm sorry, it was his contention that it was to pursue removal of these implants, which I contested because it was the gain plan that we had agreed upon six months earlier to sever my digastrics, which when I presented that information to him, it was in the context of information from another doctor that it would run the risk of crippling my ability to swallow for the rest of my life. And, you know, he didn't want to, oh boy, I'm running out of time. Let me make one more key point. All the defense and apology in one sense, it's critical that I clarify a particular point that was brought up a number of times in documents, both my own and the defense's, where references made to deposition in the state supreme court. I made an error in attributing remarks to Dr. Francis that the defense correctly identified in my testimony to Dr. Warnchuk, where he identified speculations, which were speculations because this was from my very first visit with him about an overlap condition. But he had no knowledge whatsoever. It was a baseless speculation about it being a possible defect. He had a personal prejudice against any possibility of overlap being used for these implants. His own personal design utilized no overlap whatsoever. And he had speculated this as a possible problem with no basis whatsoever. And this was wrongly interpreted as prior knowledge, which it wasn't. I go into this in great detail in my appellate brief. Thank you, Mr. Baker. We have your papers, and we've reviewed them carefully. I think unless there's one last thing you'd like to say, we could make your argument. Okay. I just want to emphasize that within the deposition, the post obviously doesn't direct the conversation. And I was just employing at that time Monday morning quarterbacking. And I just wanted to try and emphasize the degree of negligence of the client in that case in trying to present the full history of perspectives from both the good doctors and the bad doctors of the entire case history that was totally ignored by their client. Thank you very much. Thank you for your argument. Mr. Asfendis? May it please the Court, my name is Paul Asfendis. I represent Stryker Corporation, the defendant appellee. And I'll be very brief. We all know that Mr. Baker has suffered and had an unfortunate result from his surgery. And happily, I think it has apparently resolved at this point, although he had years of suffering. This, though, is a straightforward application of the statute of limitations in New York. And the rule is, and has been for over 35 years, that in a medical implant case that does not involve latent exposure to a toxic substance, the statute of limitation approves on the date of injury itself. And I think based on Mr. Baker's own papers and the complaint, we all know that injury occurred when this allegedly mis-sized, mis-dimensioned implant was placed in his jaw and impinged on the muscle. And that would have happened on the date of surgery in 2006. And this is consistent, of course, with testimony that as the numbness from the surgery wore off, the pain manifested itself more and more. But again, all of this happened in 2006. So the pain lasted seven years. I don't think there's a question in the record that the pain that started in 2006 was the same pain that eventually resolved when the implant was taken out in 2013. It's not operative when Mr. Baker discovered the cause or the diagnosis. And so for negligence and strict liability, it would have run the statute of limitations in 2009. And implied warranty is four years from the date of tender, which could not have taken place later than the surgery. And so that would have run in 2010. If there are any questions, I can answer them. Otherwise, that's all I have. I think we have the argument. We'll take the matter under advisement. Thank you both. We have one more case on our calendar today, United States v. Gomez-Rodriguez. That's on submission. The clerk will please adjourn the court.